IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| REFLEX PACKAGING, INC, <br><br> Plaintiff, <br> v. <br><br> LENOVO (UNITED STATES) INC., <br><br> Defendant. | Case No. 5:10-CV-01002-EJD <br><br> **ORDER CONSTRUING CONTESTED TERMS OF U.S. PATENT NO. 6,520,337** |

Plaintiff Reflex Packaging, Inc. ("Reflex") brings suit against Defendant Lenovo (United States) Inc. ("Lenovo") for infringement of U.S. Patent No. 6,520,337. The parties dispute the proper construction of five terms used in the claims of the patent. The court held a technology tutorial and claim construction hearing on September 7, 2011. Upon consideration of the claims, specification, prosecution history, and other relevant evidence, and after hearing the arguments of the parties, the court construes the contested language of the patent-in-suit as set forth below.

**I. BACKGROUND**

U.S. Patent No. 6,520,337 issued on February 18, 2003, to Forrest Smith, the founder of Reflex. The invention described in the patent is a "unitary product cushioning structure" designed to protect a shock-sensitive product (for example, a laptop) when placed in a box for shipping or storage. The cushion is made of thermoformed plastic, which is an improvement over foamed polystyrene and other earlier solutions because thermoplastic cushions are resilient and less bulky, and can be stackable, reusable, and recyclable. Patent cols. 1–2.

1

CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

Reflex and Lenovo ask the court to construe five terms used in the patent claims:

- "adapted to provide shock absorption protection for a shock sensitive product during shock loading conditions" (the "protection phrase") (claims 1 & 23);
- "adapted to provide shock absorption support for a product during shock loading conditions" (the "support phrase") (claims 1 & 23);
- "flexible shock absorbing spring transition section" (claims 1, 10, 16, 21, 23);
- "product supporting platform" (claims 1, 13, 23); and
- "discontinuous" (claim 10).

The parties do not dispute the relevant art or the qualifications of an individual having ordinary skill in that art. In general agreement with the statement of Plaintiff's expert, Dr. Herbert H. Schueneman, the court finds that the relevant art is protective packaging, and that a person skilled in that art would have 1) at least a bachelor-level degree in packaging or a related field, such as material science; 2) knowledge of, and industry experience with, polymeric sheet thermoforming; and 3) knowledge of and experience in the packaging industry generally.

## II. LEGAL STANDARDS

Claim construction is a question of law to be decided by the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996). Patent claims are construed in the manner that "most naturally aligns with the patent's description of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The first step in claim construction is to look to the language of the claims themselves. A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question." Phillips, 415 F.3d at 1312–13. Additionally, the use of the term in other claims may provide guidance regarding its proper construction. Id. at 1314.

The patentee's use of a claim term in the specification is highly relevant to understanding the proper context in which the term is used. Id. at 1315. Indeed, the specification is the "single best

2
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

guide to the meaning of a disputed term." Id. (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A construction that imposes limitations not found in the claims is erroneous unless it is supported by an unambiguous restriction elsewhere in the intrinsic record. In these circumstances, "the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. at 1316.

A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office regarding the scope of the invention. See Markman, 52 F.3d at 980 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."); Phillips, 415 F.3d at 1317. Because the prosecution history reflects an ongoing negotiation between the patentee and the USPTO, however, it often is difficult to determine with exact precision the scope or meaning of particular statements. Phillips, 415 F.3d at 1317. Thus, the prosecution history usually is accorded less weight than the claims and the specification. Id.

The court also may consider extrinsic evidence, such as dictionaries or technical treatises, especially if such sources are "helpful in determining the true meaning of language used in the patent claims." Phillips, 415 F.3d at 1318 (internal quotation omitted). Extrinsic evidence may aid the claim construction analysis, but cannot be used to contradict the meaning of a claim term derived from the intrinsic sources. Phillips, 415 F.3d at 1322–23.

### III. CONSTRUCTION OF DISPUTED TERMS

**"adapted to provide shock absorption protection for a shock sensitive product during shock loading conditions"** (the "protection phrase")

| Reflex's proposed construction | Lenovo's proposed construction |
| --- | --- |
| "designed to reduce shock forces exerted on a shock sensitive product when the product and its packaging encounter shock forces due to rapid acceleration (either positive or negative acceleration), such as by being dropped" | "designed or modified to reduce forces exerted on a shock sensitive product to less than 100 g's when the product and its packaging encounter shock forces in excess of 200 g's" |

As a threshold issue, the parties disagree about whether the protection phrase limits the scope

3

CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

of the patent at all since it appears only in the preambles of two independent claims.

"In general, a claim preamble is limiting if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. However, if the body of the claim describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention, the preamble is generally not limiting unless there is clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004) (citations and internal quotations omitted). Statements of an invention's intended use are generally not limiting unless the inventor relied on the use to distinguish prior art. Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 809 (Fed. Cir. 2002).

The wherein clause containing the protection phrase[1] does limit the scope of the patented invention. In both claims 1 and 23, the clause contains the only appearance of the requirement that the cushion protect against shock in two mutually perpendicular directions. That requirement is a necessary and defining aspect of the invention, and not merely an introduction to the general field of the claim or a statement of intended use. See Kropa v. Robie, 187 F.2d 150, 152 (C.C.P.A. 1951).

The protection term does more than summarize the claim by way of introduction. The claim bodies (i.e., the portions of the claims following the word "comprising") require that the invention provide shock absorption *support* in two directions, but say nothing about shock absorption *protection*. Reflex maintains that "shock absorption support" and "shock absorption protection" mean different things; if that is the case—and, as explained below, it is—the clause which contains the protection term must be a limitation on the scope of the claims. This conclusion is confirmed by the fact that other sections of the claim[2] refer back to the "three mutually perpendicular directions" to define the limitations they impose.

Given that the protection phrase is a limitation on the claim scope, the parties disagree as to whether it limits the scope of the invention by requiring some particular amount of shock reduction.

---

[1] Patent at 15:52–56 (in claim 1) and 19:17–22 (in claim 23)

[2] In particular, the two clauses containing the support phrase. Patent at 16:9–18 (in claim 1) and 20:19–28 (in claim 23).

4
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

The patent contains two mentions of specific numerical ranges of g-forces. The specification notes that the fragility of shock sensitive devices is "typically[] from 20 g's to 100 g's," Patent at 1:41–45, and that "[g]enerally, a unitary product cushioning structure in keeping with the present invention will reduce the impact forces that are imparted to the shock sensitive product being cushioned, to less than 100 g's." Patent at 15:4–10.

In addition, the inventor specifically explained the protection phrase during prosecution:

> Now, what is "shock absorption protection for a shock sensitive product during shock loading conditions"? That means that the shock sensitive product has been dropped, for example, or suddenly accelerated. There is usually a negative acceleration, but there could be a positive acceleration, which is suddenly imparted to the shock sensitive product. The best example is, of course, dropping such as a hard drive from, say, 36 inches or 42 inches, on to a concrete floor. Without any shock absorption protection, the shock sensitive product will encounter negative acceleration forces well in excess of 200 g's, when it impacts the concrete floor. Apart from damage which may occur to the exterior portions of the shock sensitive product, understandably it probably has been ruined by having been subjected to such enormous forces.
> It is the purpose of unitary product cushioning structures of the present invention to reduce the shock load which is imposed on a shock sensitive product in shock loading conditions to an acceptable limit. Typically, that limit may be in the range of 40 to 60 or 90 g's; but not 200 g's. In other words, designers and manufacturers of shock sensitive products are cognizant of the fact that in ordinary use their product may be subjected to certain shock loading conditions, but abusive conditions such as by being dropped more than, say, 6 inches, are not designed for nor acceptable.

Forrest Smith's Response to Office Action at 6–7, May 24, 2001 (filed as Blake Decl. Ex. C, Jan. 28, 2011, ECF No. 34). Lenovo contends that the inventor's statement defined the term to require that the cushion be capable of reducing shock forces of greater than 200 g to less than 100 g, and that to construe the term without defining "shock loading conditions" would render the claim indefinite and therefore invalid. Reflex argues that numerically limiting the claim scope is inappropriate.

When a claim term is expressed in "general descriptive words," it is usually improper to "limit the term to a numerical range that may appear in the written description or in other claims." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249 (Fed. Cir. 1998). On the other hand, "when a patentee uses a claim term throughout the entire specification, in a manner consistent with only a single meaning, he has defined that term by implication." Bell Atl. Network Servs. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1271 (Fed. Cir. 2001).

5
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

A recent Federal Circuit case applied these rules. In Conoco, Inc. v. Energy & Environmental Int'l, L.C., 460 F.3d 1349 (Fed. Cir. 2006), the parties disputed the construction of the claim term "water-alcohol mixture." The patent specification stated that the "amount of alcohol [in the mixture] may vary widely but it usually forms between about 0 and 70 weight percent of the suspending material, and more usually between about 30 and about 50 weight percent." The defendant-appellant argued that the claim term "water-alcohol mixture" should be defined, as indicated in the specification, as a mixture containing between zero and seventy percent alcohol. The Federal Circuit disagreed for three interrelated reasons. First, the language from the specification was used in reference to a preferred embodiment; second, the numerical ranges were not used in a context meant to limit the claims; and third, because the language itself—"may vary widely" and "usually"—inherently indicated that the ranges were not limiting.

Both appearances of a defined numerical range of g-forces in the patent itself are offered by way of example, using non-limiting language. The first mention of a particular range of g-forces in the specification (at 1:41–45) merely references the fragility levels of early shock sensitive products, and is qualified by the word "typically." The second mention (at 15:4–10) speaks generally to all embodiments of the invention, but—by the use of the word "generally"—is careful not to limit the scope of the claims. In context, the sentence teaches design parameters disclosing the best mode of practicing the invention, a requirement of the Patent Act. See 35 U.S.C. § 112. Likewise, the words "the best example" and "typically" make it clear that none of the language that identifies numerical ranges of g-forces in the quoted portion of the inventor's response to the Patent Office is inherently limiting.

Nor is it true that the patentee's use of the protection phrase is consistent only with Lenovo's proposed construction. Suppose that, over the next few years, computer manufacturers improve on the design of notebook computers so that the typical laptop is capable of withstanding a sudden acceleration of 120 g. Manufacturers of product cushioning structures like those described in the patent may respond—as the patent teaches at 13:66–14:19—by decreasing the thickness of the thermoformed plastic, which will save material but lessen the shock absorption ability of the cushion. Under Lenovo's proposed construction, the new cushion would not be covered by the

6
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

1 patent claims even though the patent plainly teaches it and the literal claim language would plainly
2 cover it. Such a result must be incorrect.

3     The court adopts Plaintiff's proposed construction of the protection phrase: "designed to
4 reduce shock forces exerted on a shock sensitive product when the product and its packaging
5 encounter shock forces due to rapid acceleration (either positive or negative acceleration), such as
6 by being dropped."

7

8 **"adapted to provide shock absorption support for a product during shock loading conditions"**
9 (the "support phrase")

| Reflex's proposed construction | Lenovo's proposed construction |
|---|---|
| "designed to hold a product so that the cushioning structure can reduce the shock forces exerted on the product when the product and its packaging encounter shock forces due to rapid acceleration (either positive or negative acceleration), such as by being dropped" | "designed or modified to hold a product while reducing shock forces exerted on the product during shock loading conditions" |

15     In both claims 1 and 23, the support phrase appears twice, modifying two different parts of
16 the cushioning structure: the inner product contacting wall and the product supporting platform. The
17 parties' constructions differ as to whether the portions of the claimed invention modified by the
18 phrase must themselves reduce shock forces exerted on a product, or whether they only need to hold
19 the product while the cushioning structure as a whole reduces the shock forces exerted.

20     Lenovo argues that the plain language compels that any structure which is claimed to provide
21 "shock absorption support" must itself absorb shock, and that to construe the term otherwise would
22 read the words "shock absorption" out of the claim term. But the plain language is not that clear. A
23 concrete slab on a bed of springs might be "adapted to provide shock absorption support," though
24 the slab by itself does not absorb shock.

25     The specification's clearest indication of the meaning of "shock absorption support" is found
26 at 11:66–12:35. The end of that passage reads,

27     Accordingly, in its broadest sense, the present invention is adapted to provide
    shock absorption support for a product during shock loading conditions in at least two
28     of the three mutually perpendicular directions, due to the inner product contacting

7
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

> wall providing shock absorption support in one direction and the product supporting platform providing shock absorption support in a second direction which is perpendicular to the first direction, <u>as a consequence of the presence of the flexible shock absorbing spring transition section</u>.

12:26–35 (reference characters omitted) (emphasis supplied). In the embodiment described, the inner product contacting wall and the product supporting platform provide shock absorption support "as a consequence of the presence" of another required portion of the structure, the flexible shock absorbing spring transition section. It follows that the inner product contacting wall and the product supporting platform do not necessarily provide shock absorption support all on their own.

Lenovo is also incorrect that Reflex's construction reads the words "shock absorbing" out of the term. Reflex's construction requires that the structure "hold a product *so that* the cushioning structure can reduce the shock forces exerted." The support must be given in such a way that facilitates the shock absorption.

This reading comports with the claim language. It is natural to speak of the inner product contacting wall and the product supporting platform as the structures which provide "shock absorption support"—even if they do not absorb shock themselves—because they are designed to be the only portions of the cushioning structure which actually touch the product.

The court adopts Reflex's proposed construction of the support phrase: "designed to hold a product so that the cushioning structure can reduce the shock forces exerted on the product when the product and its packaging encounter shock forces due to rapid acceleration (either positive or negative acceleration), such as by being dropped."

/
/
/
/
/
/
/
/

**"flexible shock absorbing spring transition section"**

| Reflex's proposed constructions | Lenovo's proposed constructions |
|---|---|
| 1. "a portion of the cushioning structure between the outer container contacting wall and the outer product supporting region defining wall that can absorb shock forces by changing its shape under shock loading conditions"<br>*or*<br>2. "a portion of the elastic cushioning structure between the outer container contacting wall and the outer product supporting region defining wall that can reduce the shock forces exerted on a product by changing its shape and then recovering most, but not necessarily all, of its original shape when the cushion is subjected to an impact within the range of impacts that the cushion is designed to protect against" | 1. "an elastic portion of the cushioning structure between the outer container contacting wall and the outer product supporting region defining wall that absorbs shock forces by flexing under shock loading conditions without permanent deformation"<br>*or*<br>2. "an elastic section that reduces shock forces by flexing and, under typical shock loading conditions, recovers its original form without visible deformation" |

In the claim construction briefing leading up to the hearing, the parties proposed the constructions numbered "1." above. In response to concerns raised by the court at the hearing, the parties submitted the constructions numbered "2."[3] Joint Supplemental Submission Re Claim Construction, Sept. 16, 2011, ECF No. 63. The supplemental submission reflected an oral agreement reached at the hearing that the section must be "elastic," and made efforts to narrow the gap between the parties' positions.[4]

The two more recent proposed constructions both make reference to typical shock loading conditions. The patent claims carefully avoid placing any limitation on the invention relating to the degree or quantity of shock absorption—this is discussed at some length in the portion of this order construing the protection phrase. Defining a claim term to depend on typical shock loading conditions invites an inquiry into what "typical" conditions are. Respecting the patent as written, the

---

[3] In particular, the court expressed the concern that Reflex's initial proposed construction read the term "spring" out of the term entirely, and that Lenovo's initial proposal might be read to require that the cushion not suffer permanent deformation under any shock loading conditions, i.e., that it be indestructible.

[4] Reflex acknowledges that the whole structure must be elastic because the claim term "resilient" was defined in prosecution to mean "elastic." See Preamble of Claims 1 & 22; Response to Office Action at 6, May 24, 2001 (filed as Blake Decl. Ex. C, Jan. 28, 2011, ECF No. 34). It apparently had objected to defining the spring transition section as elastic because of the possible implication that the spring transition section need be elastic in some way that the cushion need not.

9
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

court's construction will attempt to avoid that foray.

Claim terms are to be construed "independent" of the accused product, <u>Scripps Clinic & Research Found. v. Genentech, Inc.</u>, 927 F.2d 1565, 1580 (Fed. Cir. 1991), but courts should keep the accused product in mind in order to make an accurate claim construction in the proper context. <u>Lava Trading, Inc. v. Sonic Trading Mgmt. LLC</u>, 445 F.3d 1348, 1350 (Fed. Cir. 2006). The record includes a photograph of the accused product in Plaintiff's opening claim construction brief, and the product itself may have circulated at the <u>Markman</u> hearing, but there is no indication of how the product behaves under shock loading conditions. Even without such evidence, it is clear that the core difference in the parties' constructions is about whether the patent covers a cushion which recovers its shape after shock loading but undergoes some visible change—for example, creasing. <u>See</u> Schueneman Decl. ¶ 18, Jan. 14, 2011, ECF No. 31.

The patent describes the shock loading response of the cushioning structure as a whole and of the spring transition section in particular. With regard to the structure as a whole, the specification notes the following:

> <u>Generally</u>, the elasticity of any plastics material from which the unitary product cushioning structures of the present invention are manufactured, is such that <u>there is no permanent deformation</u> of the unitary product cushioning structures of the present invention, when they have been put to the task of absorbing shock loading so as to protect the shock sensitive product that is within them.

Patent at 14:55–61 (emphasis supplied). By using the word "[g]enerally," the patentee signaled that this passage was not intended to be a limitation. There is a requirement in the claims that the structure be "resilient," and the quoted passage is best read as a "best mode" disclosure that an embodiment is most effective when designed to resist "permanent deformation." As for the shock response of the spring transition section in particular, the patent discloses only that it is capable of "momentary collapse." Patent at 12:15–18. A "momentary collapse" must necessarily be followed by a rebound, but the extent of rebound is unspecified.

<u>Phillips</u> makes clear that the focus in claim construction is on "the meaning of claim terms within the patent," and not on "the abstract meaning of words." 415 F.3d at 1321. The dictionary definition of "spring" (an "elastic" device "that recovers its original shape") is not in dispute and only underscores the question presented here: how much of its original shape must something

10

CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

recover to be a "spring"? How much to be a "flexible shock absorbing spring transition section" in the context of a packaging device? A dictionary is of little help in answering these questions.

In evaluating this term it is of paramount important to keep in mind the perspective from which the claims are to be construed: that of a person having ordinary skill in the art of protective packaging. It is common sense that plastic packaging materials—even those capable of being reused—are less valuable than the products they are designed to protect. Shippers and receivers of shock-sensitive goods tolerate imperfect resilience of plastic packaging materials so long as the payload is protected. A packaging expert would understand the patent-in-suit to allow for visible creasing.

The court construes "flexible shock absorbing spring transition section" to mean "section that reduces shock forces by flexing and then recovering its overall shape while experiencing only cosmetic wear and tear."

**"product supporting platform"**

| Reflex's proposed construction | Lenovo's proposed construction |
| --- | --- |
| "the portion of the product supporting region that extends inwardly from the inner product contacting wall" | "raised surface of the product supporting region that holds the product above the adjacent area" |

The parties disagree about whether the invention's "product supporting platform" must be "raised" to "hold[] the product above the adjacent area." Reflex primarily contends that the term "product supporting platform" is self-explanatory, and proposes in the alternative a construction that defines the platform by reference to its position within the overall structure: "the portion of the product supporting region that extends inwardly from the inner product contacting wall." Lenovo interprets the term to mean "[a] raised surface of the product supporting region that holds the product above the adjacent area." Reflex argues that Lenovo's interpretation is an attempt to impose the "flexible joint" limitation of dependent claim 9 onto the other claims; Lenovo responds that Reflex's construction reads out any limitation inherent in the word "platform," rendering the word synonymous with "surface."

11

CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

A claim interpretation which fails to cover the patentee's preferred embodiment is "rarely, if ever, correct." <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The claims should therefore be read to cover the embodiment depicted in Figure 1 of the patent. Applying the doctrine of claim differentiation to claims 1 and 9 implies that claim 1 should cover the structure depicted in Figure 1 even if the structure lacks the chamfer labeled by reference character 70. Patent at 11:16–26; see <u>Curtiss-Wright Flow Control Corp. v. Velan, Inc.</u>, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim."). In the specification, the patentee clearly refers to the surface that supports the product as a "platform" even though it is shown in every drawing extending inwardly from the lowest part of the inner product contacting wall, and even though it is below the adjacent upper ridge. A person having ordinary skill in the art reading the term *platform* in light of the specification would understand that the platform need not itself be raised above the adjacent area.

Lenovo's proposed construction of "product supporting platform"—a "raised surface . . . that holds the product above the adjacent area"—finds no support in the language of the patent. Nothing in the patent claims imposes any limitations on the positioning of the product within the product supporting region. Moreover, such a construction would force a jury to resolve new ambiguities about what constitutes the "adjacent area" and about how much of the product must be "above" it. The dictionary definition of "platform" cited by Lenovo—"a usu[ally] raised horizontal flat surface"—confirms that platforms are usually but not always raised. As used in the '337 patent, every indication is that the term "platform" might refer to a portion of the invention that is below the adjacent portions of the structure.

One availing argument for the insertion of a "raised" requirement was made at the claim construction hearing but is not found in the papers.[5] The patent does not require that the platform be raised above the "adjacent area," but might be said to require that the platform be raised above the bottom of the cushioning structure. In other words, it is arguable that the patent claim requires that

---

[5] Curiously, the argument was made by Reflex.

12

CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

1   there be some separation between the product supporting platform and the corresponding parallel
2   surface of the outer packaging container into which the cushion fits. But reading such a limitation
3   into the term at issue is inappropriate because a "raised" requirement without the additional "above
4   the adjacent area" limitation is not actually in dispute.[6]

5   The court adopts Reflex's proposed construction of the term.

**"discontinuous"**

| Reflex's proposed construction | Lenovo's proposed construction |
|---|---|
| "having a gap or interruption in" | "having a complete gap or interruption in" |

Dependent Claim 10 of the patent limits the invention of Claim 1 by requiring (1) the presence of "at least two flexible shock absorbing spring transition sections between [] at least one outer container contacting wall and [] at least one outer product supporting region defining wall," and (2) that the outer container contacting wall be "discontinuous" between each of the spring transition sections. The parties disagree about whether the discontinuity in the outer container contacting wall must be "complete." The essence of the dispute is whether Claim 10 covers an embodiment which has at least two flexible shock absorbing spring transition sections connected by a single outer container contacting wall.

The plain meaning of discontinuous is clear—not continuous. The parties would disagree over whether "not continuous" can mean "not completely continuous." A dictionary does not help to resolve that question.

By its own terms, Claim 10—which is the only claim that includes the "discontinuous" limitation—requires only "at least one" outer container contacting wall. Lenovo acknowledges that its proposed requirement that the discontinuity in the outer container contacting wall be "complete" would further limit the claim to require the presence of at least two outer container contacting walls. See Lenovo's Responsive Claim Construction Br. 23:12–20. Requiring complete discontinuity

---

[6] The issue is not in dispute because Lenovo does not argue for it and it does not appear to affect Lenovo's noninfringement position.

13
CASE NO. 5:10-CV-01002-EJD
CLAIM CONSTRUCTION ORDER

1 would impose a stricter condition on the number of outer container contacting walls than is
2 explicitly set by language elsewhere in the same claim, so a preliminary reading of the claim
3 suggests that complete discontinuity is not required.

4 Lenovo argues that reading claim 10 in light of the patent's specification leads to a different
5 conclusion. Figure 4 of the patent discloses an embodiment which does have two outer container
6 contacting walls. Patent at 9:47–54. In that embodiment, "there are a pair of shock absorbing spring
7 transition sections, each defined by its own respective outer container contacting wall. Thus, the
8 outer container contacting wall is discontinuous between each of the flexible shock absorbing spring
9 transition sections." Lenovo contends that because Claim 10 is "clearly directed" to that
10 embodiment, it should be so limited.

11 Standing alone, the two quoted sentences explain why the depicted embodiment is covered
12 by the language of claim 10, but they do not purport to limit the scope of claim 10 to the kind of
13 discontinuity contained in the embodiment. That is, the written description does not demonstrate that
14 "the patentee [intended] for the claims and the embodiments in the written description to be strictly
15 coextensive." <u>Phillips</u>, 415 F.3d at 1323 (Fed. Cir. 2005).

16 Finally, Lenovo argues that the inventor's response to the patent examiner's non-final
17 rejection limited the meaning of the term "discontinuous" to require complete separation between
18 outer container contacting walls. The relevant portion of the inventor's response is reproduced here:

19
20
21
22
> Having regard to claim 11 [which presumably became claim 10 after renumbering], Applicant respectfully submits that the discontinuity between each of these two flexible shock absorbing spring transition sections is defined by the very language to which the Examiner has objected. The at least one container contacting wall is discontinuous <u>between</u> each of the at least two flexible shock absorbing spring transition sections. This is clearly shown in Figure 4, for example, and is clearly described in the passage at lines 21 to 25 of page 13. Applicant does not believe that amendment to claim 11 is required.

23 One natural reading of the patentee's emphasis on the word "<u>between</u>" is that the patentee is
24 telling the examiner, in effect, to look at the figure and see how <u>obvious</u> the discontinuity is. Such a
25 reading might suggest that the patentee never considered any kind of discontinuity other than a
26 complete one, and that the patent claims should therefore be limited to what he meant by
27 discontinuous. But another reading, just as plausible, is that the patentee is correcting a
28 misunderstanding of the examiner that each wall be discontinuous on its own. In that case, the

patentee was making no comment on the "completeness" of the discontinuity, but merely pointing out its location.

Because the record includes only the applicant's response—and not the examiner's rejection to which the applicant was responding—it is unclear which portion of the claim language the examiner took exception to. Moreover, the court cannot determine 1) whether the claim referred to in the response (which was then claim 11) was the same as what eventually became claim 10 of the issued patent; 2) whether Figure 4 referred to in the response is the same as Figure 4 in the issued patent; or 3) where "the passage at lines 21 to 25 of page 13" is now. Ambiguities of this type are what led the Federal Circuit to note that a patent's prosecution can be difficult to use to justify a definitive claim construction. See Phillips at 1317.

The record before the court does not give guidance sufficient to determine the meaning of the term "discontinuous." The term is not amenable to construction at this time. If either party still sincerely believes that construction of the term "discontinuous" would be an efficient use of court and party resources, it may file a request pursuant to Civil L.R. 7-11 to reopen construction of the term and to file supplemental briefs on the issue. Any such request should have the proposed supplemental brief attached (no more than five pages) and be accompanied by documents responsive to each of the concerns raised in the preceding paragraph. The case will proceed without a definite construction of that term for now.

**IT IS SO ORDERED.**

Dated: May 8, 2012

EDWARD J. DAVILA
United States District Judge